Alex D. Kruzyk (*pro hac vice*)
akruzyk@pkglegal.com
Bryan A. Giribaldo (*pro hac vice*)
bgiribaldo@pkglegal.com
**PARDELL, KRUZYK & GIRIBALDO, PLLC**
7500 Rialto Blvd. Suite 1-250
Austin, Texas 78735
Tele: (561) 726-8444

*Counsel for Plaintiff and the proposed Class*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Vicki Coffey, on behalf of herself and all others similarly situated, | ) Case No. 2:24-cv-02725-SPL |
| Plaintiff, | ) **FIRST AMENDED CLASS ACTION** ) **COMPLAINT** |
| vs. | ) **JURY TRIAL DEMANDED** |
| Fast Easy Offer LLC, GFSG LLC d/b/a Keller Williams Realty Phoenix, and Keller Williams Realty, Inc., | ) |
| Defendants. | ) |

First Amended Class Action Complaint - 1

**Nature of this Action**

1.      Vicki Coffey ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Fast Easy Offer LLC ("FEO"), GFSG LLC d/b/a Keller Williams Realty Phoenix ("KW AZ"), and Keller Williams Realty, Inc. ("KW National," and collectively, "Defendants") under the Telephone Consumer Protection Act ("TCPA").

2.      Upon information and good faith belief, Defendants routinely violate 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)(2) by delivering more than one advertisement or marketing call or text message to residential or cellular telephone numbers registered with the National Do-Not-Call Registry ("DNC Registry") without the prior express invitation or permission required by the TCPA.

**Parties**

3.      Plaintiff is a natural person who at all relevant times resided in Gilbert, Arizona.

4.      KW National is a Texas corporation with its principal place of business in Austin, Texas.

5.      KW National operates nationally through selling franchisee rights to various real estate businesses, including real estate businesses in Arizona.[1]

6.      KW AZ is an Arizona limited liability company that runs a real estate business headquartered in Tempe Arizona.

7.      FEO is an Arizona limited liability company that runs a real estate business headquartered in Mesa, Arizona.

8.      FEO's principal office and headquarters is located at 4862 E Baseline Rd #103, Mesa, AZ 85206.

9.      Brett Tanner is the statutory agent for FEO, and through his company Ignition Ventures, LLC, is a member of FEO.

---

[1]      *See* https://kwri.kw.com/open-a-franchise/ (last visited January 22, 2025).

10.    According to the Arizona Department of Real Estate, Mr. Tanner is a licensed Arizona real estate salesperson, and his license is affiliated with KW AZ.

11.    Upon information and belief, KW AZ's "Keller Williams Realty Phoenix" is a franchisee of KW National.

12.    Upon information and belief, KW AZ shares an office with FEO at 4862 E Baseline Rd #103, Mesa, AZ 85206.

## Jurisdiction and Venue

13.    This Court has subject matter jurisdiction under 47 U.S.C. § 227(b)(1)(a)(iii), and 28 U.S.C. § 1331.

14.    Venue is proper before this Court under 28 U.S.C. § 1391(b)(2) as a significant portion of the events giving rise to this action occurred in this district.

15.    In particular, the solicitation calls and text messages to Plaintiff's telephone number originated from this district, and Plaintiff received the solicitation calls and text messages in this district.

## Factual Allegations

16.    Plaintiff is, and has been at all times relevant to this action, the regular and sole user of her cellular telephone number—(480) 231-XXXX.

17.    Plaintiff uses her cellular telephone as her personal residential telephone number.

18.    In 2003, the Federal Communications Commission ("FCC") ruled that cellular telephone numbers that are placed on the DNC registry are presumed to be residential. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003).

19.    Plaintiff registered her cellular telephone number with the DNC Registry on November 8, 2004, and has maintained that registration through the present date.

20.    Starting, in early 2024, Plaintiff received numerous telephone calls and text messages from a rotating series of phone numbers, seeking to solicit Plaintiff to sell her home or engage various entities to represent or assist her in the sale of her home.

21.    Although most of these entities did not disclose their identity or use any caller identification that disclosed their identity, Plaintiff received at least the following calls from Defendants in September, 2024:



22.    The person who made these calls identified themselves as "Yannick."

23.     In addition to these calls, "Yannick" sent text messages to Plaintiff's telephone number from the (480) 648-3851 telephone number:



24.     Plaintiff did not recognize the callers, is (and was) not selling her home, and was not looking to sell her home.

25.     Upon information and good faith belief, Plaintiff received a minimum of six calls, and two text messages, from (480) 648-3851.

26.     After receiving multiple calls and text messages from Defendants from different telephone numbers, Plaintiff spoke with the caller solely to identify the entity responsible for delivering these calls and text messages.

27.     When asked for some sort of identification after Defendants delivered the unsolicited calls and text messages, Defendants provided a website link to https://www.fasteasyoffer.com.

28.     Upon information and belief, https://www.fasteasyoffer.com is owned and operated by FEO.

29.     This website, https://www.fasteasyoffer.com, explains that FEO seeks to purchase and resell residential real estate.

30.    FEO describes itself as follows: "We are a local real estate solutions company based out of Mesa. We're a family-owned business with a focus on helping homeowners like you find solutions to any problem. Whether you're going through a foreclosure, can't sell your property, or just need to sell your house fast, Fast Easy Offer can help."[2]

31.    FEO continues: "We are a real estate solutions and investment firm that specializes in helping homeowners sell their property. We are investors and problem solvers who can buy your house fast with a fair all cash offer."[3]

32.    More specifically, upon information and belief, FEO is a real estate wholesaler, which is a strategy in which a wholesaler seeks to (1) persuade a homeowner to sell their home to the wholesaler at a substantial discount below fair market value, in exchange for a suite of services to ease the sale, then (2) prior to completing the purchase, remarket the property to third-party purchasers or investors, to (3) assign or sell the contract to that investor for a substantial premium, thereby allowing the investor to step into FEO's shoes and acquire the house instead, with the difference in price solely allocated to FEO (or Defendants) as profit, instead of the homeowner.[4]

33.    An anonymous review from a former "Wholesale Acquisitions Specialist" on GlassDoor indicates that employees from FEO make 700-1000 cold calls a day, for "8 hours a day":[5]

---

[2]    https://www.fasteasyoffer.com/our-company/ (last visited January 22, 2025).

[3]    https://www.fasteasyoffer.com/privacy/ (last visited January 22, 2025).

[4]    https://www.fasteasyoffer.com/our-company/ (last visited January 22, 2025) ("Specializing in wholesaling property, flipping investment properties, packaging creative financing deals, rental portfolio development, Joe has led Fast Easy Offer to grow into one of the largest wholesale businesses nationwide.").

[5]    https://www.glassdoor.com/Reviews/Fast-Easy-Offer-Reviews-E7894137.htm (last visited January 22, 2025).

**Meh**

Wholesale acquisitions specialist
Former employee, less than 1 year    ⊙ Phoenix, AZ

✗ Recommend    ○ CEO approval    ✗ Business outlook

**Pros**
Great group of people and great environment. Expect it to be a very slow first few months and expect to be making only cold calls at first.

**Cons**
The job description does not entail the true duties you will be doing, I did not expect to be making this many calls nor was a wanting to do so. Expect to be making straight cold calls for 8 hours a day for the first few months. 700-1000 phone calls per day on average . Only intake to make leads are cold calling. Commission only, no benefits.

**Advice to Management**
Better hands on training instead of relying on a handbook.

34.     FEO's website also advertises that they pair numerous services with their offers to purchase properties from consumers.

35.     Implicit among these service offerings is the arranging of title, escrow, preparing paperwork, and all other ancillary services associated with the purchase or sale of a home.

36.     For example, FEO indicates that "[b]efore our meeting at your property, we do a comprehensive market analysis (CMA) on your home to determine what the market value of the property will be once it is completely renovated and brought up to today's HGTV standards."[6]

37.     FEO also represents that "[i]f you agree to the offer, we'll arrange a closing with a reputable attorney, and your home will be sold. It's as simple as that. We'll work according to your timeline and handle all the necessary details on your behalf. When the closing day arrives, all you have to do is show up, sign the paperwork, and within hours, you'll receive your cash."[7]

---

[6]    https://www.fasteasyoffer.com/how-we-buy-houses/ (last visited January 22, 2025).

[7]    *Id*.

38.     And, upon information and belief, in exchange for providing these services, FEO seeks to acquire Plaintiff's—and other consumers'—homes at below fair market values, to then re-sell or re-assign to a third-party purchaser for profit.

39.     In other words, consumers such as Plaintiff would pay an effective fee to FEO for their numerous ancillary services through FEO's payment of a reduced purchase price to those consumers.

40.     In fact, FEO explicitly spells this out in their website, noting that they formulate offers as follows:

**[Your Offer]** = [After Repair Value] – [Repair Costs] – [Our Selling Costs] – [Our Minimum Profit][8]

41.     The "selling costs" are explicitly described to include various closing costs that are typically part of a real estate transaction: "agent fees, closing costs, taxes, holding costs, etc."[9]

42.     Thus, upon information and belief, FEO seeks to supplant the role of a traditional real estate agent while providing the same services as a real estate agent, and in exchange for doing so, are compensated by obtaining a homeowner's property at a reduced price, and thereafter selling it at an inflated price.

43.     As a result, FEO would be (and, upon belief and information, is) compensated for their services in an analogous manner to a real estate agent: after providing services to facilitate the transaction, receiving compensation from the proceeds related to the buying or selling of a home.

44.     In fact, based on representations made by KW National through its promotional videos featuring Mr. Tanner, FEO appears to also provide, or arrange for KW AZ or KW National agents to provide, traditional real estate representation for consumers who respond to FEO's solicitations.

---

[8]     *Id.*

[9]     *Id.*

45.    Specifically, in a video titled "KW Wealth Helps Agents Succeed | Essential Tips for Real Estate Agents," hosted by KW National, Mr. Tanner touted that when soliciting consumers to sell homes to him (or FEO) directly, "9 out of 10 of them, we can't, but you know what those leads are perfect for? The team. So those leads route to the team, we go list all those, and the game goes on."[10]

46.    In other words, when FEO sends its cold call solicitations to homeowners, it seeks to either 1) wholesale the home, raising the issues discussed *supra* ¶¶ 34-43; or 2) provide traditional real estate representation as a seller's agent through the use of KW AZ and KW National real estate agents.

47.    This hybrid wholesaler/representation conduct is particularly problematic given that the FCC has specifically concluded that Defendants' conduct qualifies as a "solicitation" under the TCPA when performed by real estates.

48.    Specifically, in 2005, the National Association of Realtors petitioned the FCC for an exemption from the Do-Not-Call rules' definition of "solicitation" for calls made by real estate agents to property owners with lapsed real estate listings, where the real estate agent solicits their services to a prospective seller. *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788 (2005).

49.    In interpreting the definition of "telephone solicitation," the FCC rejected this exemption, and concluded "that a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner, whether the property listing has lapsed or not." *Id.* at 3793-94.

50.    As a result, Defendants' conduct fits squarely within the TCPA's definition of telemarketing or solicitation, as reinforced by the FCC.

---

[10]    https://youtu.be/LcBpWq1c5vI?si=CVAPatV35-MIwhm1&t=358    (last    visited January 22, 2025) (excerpted language at 6:55-7:04).

51.    Public consumer reviews corroborate FEO's wholesaling and mass telemarketing efforts:[11]




---

[11]    *See* https://www.google.com/search?q=Fast+easy+offer+reviews&sca_esv=4b629c57e28de7e7&sxsrf=ADLYWIK5Ss_vt9Uo18bZ3if0fh3BC7Y2-Q%3A1728411000248&ei=eHUFZ4b2DsLIwN4P8eymSA&ved=0ahUKEwiGksjdsP-IAxVCJNAFHXG2CQkQ4d4UDCA8&uact=5&oq=Fast+easy+offer+reviews&gs_lp=Egxnd3Mtd2l6LXNlcnAiF0Zhc3QgZWFzeSBvZmZlciByZXZpZXdzMgoQIxiABBgnGIoFMhEQLhiABBiRAhjHARiKBRivATILEAAYgAQYYhgMYigUyCxAAGIAEGIYDGIofMggQABiABBiiBDIIEAAYogQYiQUyCBAAGIAEGKIEMggQABiABBiiBDIgEC4YgAQYkQIYxwEYigUYrwEYlwUY3AQY3gQY4ATYAQFI5wVQjgNYjgNwAngBkAEAmAFloAFlqgEDMC4xuAEDyAEA-AEBmAIDoAJ1wgIKEAAYsAMY1gQYR5gDAIgGAZAGCLoGBggBEAEYFJIHAzIuMaAH9gg&sclient=gws-wiz-serp#    (last    visited    January    22,    2025); https://www.bbb.org/us/az/mesa/profile/real-estate-investing/fast-easy-offer-1126-1000049958/customer-reviews (last visited January 22, 2025).

52.  Upon information and belief, FEO and KW AZ share employees and offices.[12]

53.  FEO's team photo on its website shows one or more of KW AZ's real estate agents or employees, including Mr. Tanner.[13]

54.  Additionally, Google Maps searches of FEO's listed address show that the listed name of the suite is KW AZ's business name: Keller Williams Realty Phoenix.

55.  Upon information and belief, if FEO does not wholesale a given property, FEO instead utilizes KW AZ's licensed real estate professionals to list properties for sale.

56.  Upon information and belief, given the overlap between FEO and KW AZ, KW AZ has knowledge of, and control of, FEO's operations.

57.  Upon information and belief, KW AZ's control over FEO's operations extends to FEO's telemarketing operations.

58.  Upon information and belief, KW AZ operates or partners with FEO as part of its real estate wholesaler operations, including directing, or causing, FEO to mass market to consumers via telephone call and text message campaigns.

59.  Alternatively, KW AZ knew or should have known that FEO mass marketed to consumers via telephone call and text message campaigns as part of FEO's efforts to perform real estate wholesale operations on behalf of KW AZ, and KW AZ knowingly accepted the benefits of FEO's telemarketing operations and ratified FEO's conduct.

60.  Furthermore, upon information and belief, KW AZ and FEO share revenue resulting from these efforts, and KW National receives a percentage of the revenue obtained by KW AZ.

---

[12]  *See, e.g.*, https://www.indeed.com/cmp/Brett-Tanner-Team-Fast-Easy-Offer (last visited October 8, 2024) (displaying real estate agent and sales positions).

[13]  https://www.fasteasyoffer.com/our-company/ (last visited January 22, 2025).

61.     Upon information and belief, FEO and KW AZ's scheme of utilizing a "cash buyer" to wholesale real estate along with a traditional real estate operation is propagated on a national level by KW National.

62.     In fact, KW National offers a paid subscription program called "KW Wealth," which is ran by Mr. Tanner, to help build the wealth of Keller Williams' real estate agents.[14]

63.     Upon information and belief, KW National runs and owns KW Wealth.

64.     Upon information and belief, this educational program is to teach KW National's agents how to start up wholesaling businesses, like FEO, as a supplemental source of income to more-traditional real estate representation.

65.     By actively promoting this program to their national roster of agents, lending their trade name and resources, and providing KW Wealth training, technology, and promotional materials, KW National is either directly responsible for sending the communications at issue, or ratified Mr. Tanner's wholesaling business model exemplified by FEO and KW AZ.[15]

66.     Upon information and belief, KW National's KW Wealth program is tied to, or incorporates, Mr. Tanner's "Be Wealthy" training and education program.[16]

---

[14]     https://outfront.kw.com/performance/keller-williams-introduces-kw-wealth-to-help-real-estate-agents-achieve-50-million-in-net-worth/ (last visited January 22, 2025) ("That's why we partnered with renowned real estate investor Brett Tanner to launch KW Wealth. Brett and his team have cracked the code to achieving $50 million in personal net worth. Over the course of their workshops, community members will learn, in detail, how to find and capitalize on investment opportunities, run the right numbers for their goal, grow in a network of like-minded peers, and earn incredible 'behind the rope' access to thought leaders in the wealth space."); *see also* KW Wealth Community Terms and Conditions, attached hereto as Exhibit A.

[15]     https://communities.kw.com/community/kw-wealth/ (last visited January 22, 2025); *see also* https://thrive.kw.com/technology/ (last visited January 22, 2025) (touting the lead generation and technology platforms KW Wealth provides to its franchisees and agents).

[16]     https://bewealthy.com/training/ (last visited January 22, 2025).

67.    Notably, the operations team for "Be Wealthy," and thus KW Wealth, includes Mr. Tanner, Katelyn Mitchell, Sabrina Song, Melissa Goslin, and Joe Dunseath, all of whom are *also* depicted on FEO's website.[17]

68.    KW National notes that its KW Wealth team employs Mr. Tanner as "Head Coach," Ms. Mitchell as an "Operations Coach," Ms. Song as an "Operations Coach," Ms. Goslin as a "Hard Money Lending/Wholesale Coach," and Mr. Dunseath as an "Investment/Wholesale Coach."[18]

69.    Furthermore, Mr. Tanner, Ms. Goslin, and Ms. Song are all listed on KW AZ's agent roster.[19]

70.    Moreover, according to the Arizona Department of Real Estate, in addition to Mr. Tanner, Ms. Goslin and Ms. Song are each current agents affiliated with KW AZ, and Mr. Dunseath was previously a KW AZ agent, but terminated that license in 2018.

71.    Therefore, upon information and belief, the KW Wealth program includes instruction and education over wholesaling activities similar to those conducted by FEO.[20]

72.    Upon information and good faith belief, KW Wealth is, at its core, designed to facilitate Keller Williams-affiliated agents using their status as real estate agents to become real estate investors through wholesaling and solicitation, just as FEO did here.

73.    Specifically, KW Wealth states that it will provide the tools to agents, and train them, on "how to bring in deals, evaluate them for maximum profit, and do this all

---

[17]    *Compare* https://bewealthy.com/meet-the-team/ (last visited January 22, 2025) *with* https://www.fasteasyoffer.com/how-we-buy-houses/ (last visited January 22, 2025).

[18]    *Id.*

[19]    https://phoenix.kw.com/our-agents?p=3 (last visited January 22, 2025); https://phoenix.kw.com/our-agents?p=8 (last visited January 22, 2025).

[20]    *See* https://bewealthy.com/training/ (last visited January 22, 2025) (changed since October 8, 2024, but previously discussing various aspects of wholesaling and "wholetailing", including marketing and setting up such businesses).

on a consistent basis. The #1 way to find the best deals for your portfolio – make it a business."[21]

74.    KW Wealth also touts that it is designed for "[p]eople who want a clear way to step away from the daily grind of real estate and into the management of investments for income streams."[22]

75.    Therefore, the entire purpose of KW Wealth is to train and facilitate Keller Williams-affiliated agents to engage in real estate wholesaling and private transactions, just as FEO did here.

76.    In one video hosted by KW National, in a "Live Q&A" with Mr. Tanner and Lalaina Rabary, who upon information and belief was Director of Strategic Communications at KW National, Mr. Tanner discusses how he (and FEO), using techniques and the approaches touted by KW Wealth, could "change the mindset" about "ibuyers"[23] and to "be your own ibuyer," and that real estate agents "overlook" opportunities to "take advantage" of opportunities to buy homes from consumers for substantial discounts, rather than offer conventional real estate representation.[24]

---

[21]    https://www.mykwwealth.com/coaching/#kw-wealth-community (last visited January 22, 2025).

[22]    https://www.mykwwealth.com/kw-wealth-mastermind/ (last visited January 22, 2025).

[23]    https://www.zillow.com/learn/what-is-an-ibuyer/ ("An iBuyer is a company that buys homes almost instantly by relying on technology to determine a market-based cash offer. iBuyers complete the purchase transaction online, often sight unseen, which means the homeowner gets to sell their home in a quick sale while skipping a lot of steps in the traditional home-selling process.") (last visited January 22, 2025).

[24]    https://www.facebook.com/KellerWilliamsRealty/videos/412189454015428 (last visited January 22, 2025) (at 4:40-7:00); *see also* https://www.facebook.com/share/p/1KrvxS3BsS/ (advertising the above-referenced Q&A by stating: "Join us for a conversation with Brett Tanner - Director of KW's newest community, KW Wealth and Team Owner of Elite Home Advisors and Lalaina Rabary, KWRI Director of Strategic Communications.") (last visited January 22, 2025).

77.     In that video, Mr. Tanner touts how a Keller Williams real estate agent, after obtaining the training and "tools" offered by KW National's KW Wealth program, converted a conventional real estate listing into an "opportunity" to purchase the home from the homeowner directly and then flip it for $55,000 profit, for the agent's benefit rather than the homeowner's.[25]

78.     By virtue of KW National's KW Wealth program and ongoing efforts to propagate supplemental wholesaling business models on its agents, KW National is either directly responsible for sending the communications at issue, or ratified FEO's conduct of wholesaling through mass telemarketing.

79.     Moreover, given that FEO—which is run by the leader of KW National's KW Wealth program—engaged in the telemarketing and solicitation campaign at issue here in direct furtherance of KW Wealth's stated goals, and using the techniques and tools promoted by and facilitated by KW Wealth, FEO acted with KW National's apparent and actual authority in sending the messages at issue.

80.     Because KW National directs its KW Wealth participants for techniques and tools to directly solicit homeowners to sell their properties to Keller Williams-affiliated agents, KW National endorsed or directed FEO to send the text messages and calls at issue.

81.     And, given that Mr. Tanner (and therefore, FEO) acknowledge that they provide conventional real estate representation to homeowners that were not interested in selling directly to him (or FEO), FEO was sending the text messages and calls for KW AZ and KW National's ultimate benefit.

82.     Because KW National knew and actively promoted Mr. Tanner (and FEO's) conduct, and encouraged other Keller Williams-affiliated real estate agents to adopt the same processes, and because KW National ratified FEO's telemarketing and solicitation efforts.

---

[25]     *Id.*

83. Upon information and good faith belief, KW National profits on Defendants' telemarketing and solicitation campaign in two ways: 1) for any conventional real estate representation, as discussed *supra* ¶¶ 45-46, KW National receives a 6% fee on each transaction, capped at $3,000;[26] and 2) KW National charges a subscription fee to any agents who use its KW Wealth program—between $199.00 a month and $1,000/month[27]—which provides training, promotional materials, and technological support for its affiliate agents who engage in such "real estate wholesaling" telemarketing.

84. Plaintiff did not give Defendants prior express consent or prior express written consent to deliver calls or text messages to her cellular telephone number.

85. The calls and text messages at issue were sent for non-emergency purposes.

86. Upon information and good faith belief, the calls and text messages at issue were delivered by Defendants voluntarily.

87. The purpose of the calls and text messages at issue was to advertise and to market Defendants' business or services.

88. Additionally, upon information and belief, Defendants also collect motivated seller consumer data and resell that information to investors, including by way of executing assignment contracts.

89. As a result, Defendants: (1) solicited Plaintiff to sell her home to them at a discount in order for Defendants to resell or rent Plaintiff's home; (2) solicited Plaintiff to submit her information to Defendants' lead generation service and, if Plaintiff expressed an interest in selling her home, Defendants would then sell that via an assignment contract to investors for a profit; or (3) Defendants solicited Plaintiff to, as an alternative to wholesaling her home, having Plaintiff utilize one of Defendants' traditional real estate agents to list that home for same.

---

[26]    https://www.youdrivethesuccess.com/keller-williams-commission-split/    (last visited January 22, 2025).

[27]    https://answers.kw.com/hc/en-us/articles/12986454322707-KW-Wealth-Community-FAQs (last visited January 22, 2025).

90.     Plaintiff did not give Defendants prior express invitation or permission to deliver advertisement or marketing calls or text messages to her cellular telephone number.

91.     Plaintiff suffered actual harm as a result of the calls and text messages at issue in that she suffered an invasion of privacy, an intrusion into her life, and a private nuisance.

92.     Plaintiff suffered additional harm due to her frustration and difficulty in identifying the entity and persons responsible for the unwanted advertisement or marketing calls and text messages to her cellular telephone number.

93.     Upon information and good faith belief, Defendants knew, or should have known, that Plaintiff registered her cellular telephone number with the DNC Registry.

**Class Action Allegations**

94.     Plaintiff brings this action under Federal Rule of Civil Procedure 23, and as a representative of the following class (the "Class"):

> All persons throughout the United States (1) to whom Fast Easy Offer LLC, GFSG LLC d/b/a Keller Williams Realty Phoenix, or Keller Williams Realty, Inc. delivered, or caused to be delivered, more than one telephone call or text message within a 12-month period, promoting Fast Easy Offer LLC's, GFSG LLC d/b/a Keller Williams Realty Phoenix's, or Keller Williams Realty, Inc.'s, or their business partners', goods or services, (2) where the person's residential or cellular telephone number had been registered with the National Do Not Call Registry for at least thirty days before Fast Easy Offer LLC, GFSG LLC d/b/a Keller Williams Realty Phoenix, or Keller Williams Realty, Inc. delivered, or caused to be delivered, at least two of the telephone calls or text messages within the 12-month period, (3) within four years preceding the date of this complaint through the date of class certification.

95.     Excluded from the Class is Defendants, their officers, directors, managers, and members, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

96.     Upon information and belief, the members of the Class are so numerous that

joinder of all of them is impracticable.

97.     The exact number of members of the Class is unknown to Plaintiff at this time and can be determined only through appropriate discovery.

98.     The members of the Class are ascertainable because the Class is defined by reference to objective criteria.

99.     In addition, the members of the Class are identifiable in that, upon information and belief, their cellular telephone numbers, names, and addresses can be identified in business records maintained by Defendants, and by third parties.

100.    Plaintiff's claims are typical of the claims of the members of the Class.

101.    As it did for all members of the Class, Defendants delivered solicitation telephone calls or text messages to Plaintiff's telephone number more than thirty days after Plaintiff registered her cellular telephone number with the DNC Registry.

102.    Plaintiff's claims, and the claims of the members of the Class, originate from the same conduct, practice, and procedure on the part of Defendants.

103.    Plaintiff's claims are based on the same theories as are the claims of the members of the Class.

104.    Plaintiff suffered the same injuries as the members of the Class.

105.    Plaintiff will fairly and adequately protect the interests of the members of the Class.

106.    Plaintiff's interests in this matter are not directly or irrevocably antagonistic to the interests of the members of the Class.

107.    Plaintiff will vigorously pursue the claims of the members of the Class.

108.    Plaintiff has retained counsel experienced and competent in class action litigation.

109.    Plaintiff's counsel will vigorously pursue this matter.

110.    Plaintiff's counsel will assert, protect, and otherwise represent the members of the class.

111.    The questions of law and fact common to the members of the Class predominate over questions that may affect individual members of the Class.

112.    Issues of law and fact common to all members of the Class are:

a.    Defendants' conduct, pattern, and practice as it pertains to delivering advertisement and telemarketing telephone calls or text messages;

b.    For the Class, Defendants' practice of delivering telephone calls or text messages, for solicitation purposes, to telephone numbers already registered on the DNC Registry for more than thirty days;

c.    Whether KW AZ is responsible for the conduct of FEO based on agency theories;

d.    Whether KW National is responsible for the conduct of FEO based on agency theories;

e.    Defendants' violations of the TCPA; and

f.    The availability of statutory penalties.

113.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter.

114.    If brought and prosecuted individually, the claims of the members of the Class would require proof of the same material and substantive facts.

115.    The pursuit of separate actions by individual members of the Class would, as a practical matter, be dispositive of the interests of other members of the Class, and could substantially impair or impede their ability to protect their interests.

116.    The pursuit of separate actions by individual members of the Class could create a risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for Defendants.

117.    These varying adjudications and incompatible standards of conduct, in connection with presentation of the same essential facts, proof, and legal theories, could also create and allow the existence of inconsistent and incompatible rights within the Class.

118.    The damages suffered by the individual member of the Class may be relatively small, thus, the expense and burden to litigate each of their claims individually make it difficult for the members of the Class to redress the wrongs done to them.

119.    The pursuit of Plaintiff's claims, and the claims of the members of the Class, in one forum will achieve efficiency and promote judicial economy.

120.    There will be no extraordinary difficulty in the management of this action as a class action.

121.    Defendants acted or refused to act on grounds generally applicable to the members of the Class, making final declaratory or injunctive relief appropriate.

**Count I**
**Violation of 47 U.S.C. § 227(c)(5)**
**On behalf of the Class**

122.    Plaintiff repeats and re-alleges each and every factual allegation contained in paragraphs 1-121.

123.    A text message is a "call" as defined by the TCPA. *See, e.g.*, *Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 280 n.4 (2d Cir. 2020) ("It is undisputed that '[a] text message to a cellular telephone . . . qualifies as a 'call' within the compass of [the TCPA].'") (internal citation omitted); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009).

124.    The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

125.    Section 64.1200(e) provides that §§ 64.1200(c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers."

126.    Any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed

under this subsection may" may bring a private action based on a violation of those regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. § 227(c).

127.    Defendants violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiff and the class members who registered their respective cellular or residential telephone numbers with the DNC Registry, which is a listing of persons who do not wish to receive telephone solicitations that is maintained by the federal government.

128.    Defendants violated 47 U.S.C. § 227(c)(5) because they delivered, or caused to be delivered, to Plaintiff and members of the Class, more than one solicitation telephone call or text message in a 12-month period in violation of 47 C.F.R. § 64.1200.

129.    In the alternative, FEO violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiff and the class members who registered their respective cellular or residential telephone numbers with the DNC Registry, and KW AZ and KW National are liable for FEO's violations because (1) they ratified FEO's conduct by either accepting leads generated by FEO's telemarketing campaign, agreeing to share revenue with FEO (or, in the case of KW National, KW AZ) that arose out of that telemarketing campaign, and promoting, educating, and instructing agents to build wholesaling businesses that rely on unsolicited telemarketing, like FEO; or (2) FEO acted with actual authority on behalf of KW AZ and KW National in telemarketing to consumers who registered their respective cellular or residential telephone numbers on the DNC Registry without obtaining prior express written consent.

130.    As a result of Defendants' violations of 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200, Plaintiff, and the members of the Class, are entitled to damages in an amount to be proven at trial.

### Prayer for Relief

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action;

b.    Designating Plaintiff as a class representative of the class under Federal Rule of Civil Procedure 23;

c.    Designating Plaintiff's counsel as class counsel under Federal Rule of Civil Procedure 23;

d.    Adjudging and declaring that Defendants violated 47 U.S.C. § 227(c)(5);

e.    Enjoining Defendants from continuing their violative behavior, including continuing to deliver solicitation telephone calls and text messages to telephone numbers registered with the DNC Registry for at least thirty days;

f.    Awarding Plaintiff and the members of the class damages under 47 U.S.C. § 227(c)(5)(B);

g.    Awarding Plaintiff and the members of the Class treble damages under 47 U.S.C. § 227(c)(5)(C);

h.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses under Rule 23 of the Federal Rules of Civil Procedure;

i.    Awarding Plaintiff and the members of the Class any pre-judgment and post-judgment interest as may be allowed under the law; and

j.    Awarding such other and further relief as the Court may deem just and proper.

## Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all triable issues.

Date: January 22, 2025.      By:*/s/ Alex D. Kruzyk*
                      Alex D. Kruzyk (*pro hac vice*)
                      akruzyk@pkglegal.com
                      Bryan A. Giribaldo (*pro hac vice*)
                      bgiribaldo@pkglegal.com
                      **Pardell, Kruzyk & Giribaldo, PLLC**

7500 Rialto Blvd. Suite 1-250
Austin, Texas 78735
Tele: (561) 726-8444

*Counsel for Plaintiff and the proposed Class*