Alex D. Kruzyk (*pro hac vice*)
akruzyk@pkglegal.com
Bryan A. Giribaldo (*pro hac vice*)
bgiribaldo@pkglegal.com
**PARDELL, KRUZYK & GIRIBALDO, PLLC**
7500 Rialto Blvd. Suite 1-250
Austin, Texas 78735
Tele: (561) 726-8444

*Counsel for Plaintiff and the proposed Class*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Vicki Coffey, on behalf of herself and all others similarly situated, | Case No. 2:24-cv-02725-SPL |
| Plaintiff, | **PLAINTIFF'S RESPONSE IN OPPOSITION TO KELLER WILLIAMS REALTY INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| vs. | |
| Fast Easy Offer LLC, GFSG LLC d/b/a Keller Williams Realty Phoenix, and Keller Williams Realty, Inc., | |
| Defendants. | |

## I. Introduction

Through their prior motion to dismiss, ECF No. 24, Keller Williams Realty, Inc. ("KWRI"), Fast Easy Offer LLC ("FEO"), GFSG LLC d/b/a Keller Williams Realty Phoenix ("KW AZ") (together, "Defendants") sought dismissal of Vicki Coffey's ("Plaintiff") Telephone Consumer Protection Act ("TCPA") claims on the basis that the communications at issue did not plausibly qualify as telemarketing. *See* ECF Nos. 27, 34. KWRI separately sought dismissal on vicarious liability grounds. *Id.* The Court initially granted the motion, holding that Defendants had not engaged in telemarketing. *Id.* Plaintiff appealed and the Ninth Circuit reversed, holding that Defendants' calls and text messages plausibly amounted to telemarketing prohibited by the TCPA. *See* ECF Nos. 27, 34. Neither this Court nor the Ninth Circuit addressed KWRI's vicarious liability argument, and KWRI now renews its motion to dismiss on that basis. *See* ECF No. 38.

KWRI's motion should be denied. KWRI strains to paint this matter as one in which a pseudo-independent real estate agent went rogue and violated the TCPA unbeknownst to KWRI, thereby (in KWRI's view) absolving KWRI for its agents' conduct. But that self-serving narrative bears no resemblance to Plaintiff's actual allegations, which provide detailed allegations of KWRI's substantial involvement in—and knowledge and promotion of—the unlawful scheme. Specifically, KWRI runs a program—KW Wealth—that is *led* by Brett Tanner, the owner of FEO, and KW Wealth's operations team *is* the ownership and management of FEO. KW Wealth's entire business model centers around paid subscriptions through which it trains its agents to engage in, among other things, *precisely the real estate wholesaling and telemarketing conduct at issue here*. KWRI only allows its own active associates to participate in KW Wealth, *see* ECF No. 19-1, and KWRI provides technology to facilitate such real estate telemarketing, including lead generation support. These are just a few examples demonstrating KWRI's intimate involvement in the telemarketing scheme challenged in this case. Plaintiff more than adequately pleads facts to show KWRI's knowledge, promotion, and ratification of, Mr. Tanner's—and therefore, FEO's—conduct.

Given the depth of allegations as to KWRI's involvement in this telemarketing campaign, the Court should find that Plaintiff sufficiently alleges that KWRI may be found liable for violating the TCPA on the basis of agency, and deny KWRI's motion to dismiss.

## II. Statement of Facts

Plaintiff is, and has been at all times relevant to this action, the regular and sole users of her cellular telephone number, which she uses as her personal residential telephone number and which has been registered to the National Do-Not-Call Registry since she registered it in 2004. ECF No. 19 at ¶¶ 16-19. Beginning in early 2024, Plaintiff received several telemarketing telephone calls and text messages from a series of rotating telephone numbers, seeking to solicit Plaintiff to sell her home or engage various entities to represent or assist her in the sale of her home, and purportedly for purchasing Plaintiff's home for resale to third-party investors. *Id.* at ¶¶ 20-27. These messages and calls were seemingly initiated by FEO, which operates out of KW AZ's[1] office, a franchisee of KWRI. *Id.* at ¶ 11. KWRI operates KW Wealth, which is run by FEO's owner, Brett Tanner—along with Katelyn Mitchell, Sabrina Song, Melissa Goslin, and Joe Dunseath, each of whom also appear to work for, or own, FEO—and which purports to help build the wealth of KWRI's licensed real estate agents. *Id.* at ¶¶ 62, 67.

KW Wealth purports to train its agents on how to conduct real estate wholesaling businesses just like FEO. *Id.* at ¶ 64. Plaintiff further alleges that KW Wealth provides the tools for its agents, including FEO, to perform such outbound telemarketing, including providing lead generation tools, training, technology, and promotional materials. *Id.* at ¶ 64. In fact, KW Wealth is run almost entirely by FEO owners or employees, including various "wholesale coaches." *Id.* at ¶ 68. KW Wealth is exclusively available to "active KW[RI] associates and in good standing at all times," and charges its agents between $199 per month and $1,000 per month to subscribe to KW Wealth. ECF No. 19-1.

KWRI heavily promotes its KW Wealth program, and FEO's actions, in its

[1] KW AZ is one of KWRI's Arizona-based franchisees. *Id.* at ¶ 11.

promotional materials, including by hosting videos that discuss and promote FEO's conduct. In one video titled "KW Wealth Helps Agents Succeed | Essential Tips for Real Estate Agents," KWRI hosted and promoted a video in which Mr. Tanner touts that when soliciting consumers to sell homes to him (or FEO) directly, "9 out of 10 of them, we can't, but you know what those leads are perfect for? The team. So those leads route to the team, we go list all those, and the game goes on." *Id.* at ¶ 45. The team, in that instance, refers to Mr. Tanner's "team" of KWRI-affiliated agents. *Id.* In another KWRI video, a "Live Q&A" with Mr. Tanner and Lalaina Rabary (who was "Director of Strategic Communications" at KWRI) Mr. Tanner discusses how he (and FEO), using techniques and the approaches touted by KW Wealth, could "change the mindset" about "ibuyers"[2] and to "be your own ibuyer," and that real estate agents "overlook" opportunities to "take advantage" of opportunities to buy homes from consumers for substantial discounts, rather than offer conventional real estate representation. *Id.* at ¶ 76. As an example, Mr. Tanner noted in that video that he trained a KWRI agent through the KW Wealth program to do precisely that, in which she converted a conventional real estate listing into an "opportunity" to purchase the home from the homeowner directly and then flip it for $55,000 profit, for the agent's benefit rather than the homeowner's. *Id.* at ¶ 77. In exchange for this, KWRI receives monthly subscription fees from its agents, as well as direct compensation from commissions through listing and sale of properties by Keller Williams agents. *Id.* at ¶ 83.

## III. Legal Standard

A complaint need only "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a motion to dismiss, the court construes the complaint in the light most favorable to the non-moving party, accepts all

---

[2] "An iBuyer is a company that buys homes almost instantly by relying on technology to determine a market-based cash offer. iBuyers complete the purchase transaction online, often sight unseen, which means the homeowner gets to sell their home in a quick sale while skipping a lot of steps in the traditional home-selling process." *Id.* at ¶ 76 n.23.

allegations as true, and draws all inferences in the non-moving party's favor. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). "A claim is facially plausible when the plaintiff's complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct." *Larson v. Homecomings Fin., LLC*, 680 F. Supp. 2d 1230, 1233 (D. Nev. 2009).

## IV. Argument

### A. KWRI is vicariously liable for the telemarketing conduct at-issue.

Plaintiff plausibly alleges that KWRI is vicariously liable for the conduct of FEO, along with its team of licensed real estate agents.

KWRI seeks dismissal of Plaintiff's claims against it because it contends that KW Wealth—which KWRI runs—is too far removed from the violations alleged in Plaintiff's complaint. KWRI believes this despite: (1) promoting FEO's conduct; (2) providing infrastructure and support to FEO; (3) hiring most of—if not all—of FEO's ownership and management to work for KWRI for the purpose of directly promoting the very telemarketing scheme underlying this complaint; and (4) doing all this in exchange for two income streams: (a) commission sharing with its agents for consummating real estate transactions; and (b) monthly membership fees charged to its agents in exchange for teaching them how to do the very conduct underlying this complaint.

TCPA liability can extend from a caller to the entity on whose behalf a call is made or who will ultimately benefit from it based on agency principles. *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 878 (9th Cir. 2014) ("the FCC has clarified that vicarious liability is imposed 'under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers.'"). This is typically determined via express authority, apparent authority, or ratification. *Id.* As explained below, Plaintiff's allegations satisfy each of these three paths to liability.

For TCPA claims specifically, there is a low bar to pleading vicarious liability, as a plaintiff is not expected to allege facts suggesting that a defendant: (1) instructed a putative agent to make a call to a plaintiff, (2) had any authority over the time, means and

manner of the solicitations, or (3) had the ability to issue instructions on these subjects. *See, e.g.*, *Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988, 997 (N.D. Ill. 2016) ("Indeed, it is likely that all of the documents and information that establish (or refute) the details of the agency relationship . . . are exclusively within the Defendants' custody and control."); *Thomas v. Elite Legal Prac. PC*, No. CV 25-10854-MWF (MAAx), 2026 U.S. Dist. LEXIS 85812, at *8 (C.D. Cal. Mar. 23, 2026) (same). KWRI's reliance on *summary judgment* caselaw underscores this point, as requiring more of Plaintiff at this stage than what she pled would largely not be feasible. As the Northern District of West Virginia explained in *Mey v. Venture Data, LLC*, "[r]equiring plaintiffs to allege summary-judgment type evidence at the motion to dismiss stage would establish a near-insurmountable pleading standard," as it would allow principals to "enjoy the benefits of illegal automated telephone calls without fear of liability by simply paying others to place illegal calls on their behalf, since the majority of persons called would be unable to plead the principal's vicarious liability with sufficient particularity." No. 5:14-CV-123, 2016 U.S. Dist. LEXIS 203388, at *15 (N.D.W. Va. July 26, 2016). Rather, in acknowledgement of that necessary informational gap, a plaintiff is required only to allege facts that would plausibly point toward an agency relationship, which Plaintiff does here.

**1. Plaintiff sufficiently alleges that FEO acted with KWRI's actual authority.**

Plaintiff plausibly alleges that FEO acted with KWRI's actual authority.

An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent to so act. Restatement (Third) Of Agency § 3.01. Actual authority can be express or implied. Express actual authority derives from an act specifically mentioned to be done in a written or oral communication. *See NLRB v. District Council of Iron Workers of the State of California and Vicinity*, 124 F.3d 1094, 1098 (9th Cir. 1997). "Implied actual authority comes from a general statement of what the agent is supposed to do; an agent is said to have the implied authority to do acts consistent with that direction." *Id.* As explained by

one court:

> The concept of scope of authority is broad. An agent has authority to act to further the principal's objectives, "as the agent reasonably understands the principal's manifestations and objectives." The principal is liable for the acts of the agent to further the principal's purposes unless the agent acts entirely for the agent's benefit only.

*United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 923 (C.D. Ill. 2017) (finding telemarketers acted with principal's authority despite that the telemarketing was outside scope of granted authority) (cleaned up). "An essential element of agency is the principal's right to control the agent's actions", but this concept of control "embraces a wide spectrum of meanings", including "what the agent shall and shall not do, in specific or general terms." Restatement (Third) of Agency § 1.01 cmt f. "A principal's control over an agent will as a practical matter be incomplete because no agent is an automaton who mindlessly but perfectly executes commands." *Id.*

Plaintiff sufficiently alleges that Mr. Tanner (and FEO) acted with KWRI's actual authority in telemarketing to consumers. Most pointedly, Plaintiff cites to videos hosted by, and promoted by, KWRI, in which Mr. Tanner touts the use of cold-calling for real estate wholesaling purposes, all while promoting KWRI's KW Wealth program—run by Mr. Tanner—to teach other KWRI-licensed agents to do the same thing. ECF No. 19 at ¶¶ 45, 62-68, 76-77. Plaintiff further details how KWRI profits from this enterprise in two ways: (1) commission-sharing with the agents that generate business arising out of cold-calling; and (2) charging subscriptions to its licensed agents to teach them how to do the same thing. *Id.* at ¶ 83. This is tied to the broader context of Defendants' relationships: FEO's owners and most of its employees are Keller Williams agents, who *also* work as licensed agents for KW AZ while also working directly for KWRI through the KW Wealth program. This overarching joint venture,[3] along with Plaintiff's allegations pertaining to

---

[3] KWRI cites to *Jance v. Homerun Offer, LLC*, No. CV-20-00482-TUC-JGZ, 2021 U.S. Dist. LEXIS 143145 (D. Ariz. July 29, 2021) for the notion that where "the same individual was alleged to be the President and CEO of both defendant corporations, the relationship

KWRI training, supporting, and promoting real estate wholesaling via the methods used by FEO while employing FEO's owners and managers to provide that training, plausibly holds KWRI liable for FEO's telemarketing efforts under a theory of actual authority.

That narrative is, in essence, the exact definition of "implied actual authority" discussed in *District Council of Iron Workers*. 124 F.3d at 1098. KWRI posted, and promoted, the general statement that agents should aspire to follow FEO's actions by interviewing and promoting its owner, Mr. Tanner, talking about those actions (including touting the benefits of his use of cold-call telemarketing), and offering to train agents to be more like FEO (after first paying a fee to KWRI). Thus, the Court should find that such explicit, active promotion is a general endorsement of FEO's conduct, such that KWRI should not be surprised that FEO acted consistent with that direction. In a related circumstance, the court in *Hayhurst v. Keller Williams Realty, Inc.* found that the plaintiff sufficiently alleged KWRI's agency via actual authority based on the following:

> The allegations show that Karmel and someone else on behalf of Keller Williams acted with actual authority when they called Hayhurst in the face of Keller Williams' specific, detailed training and materials, as well as with implied authority because a reasonable realtor would interpret the company's extensive training operations, its content, and materials as manifesting Keller Williams' expectation that agents obtain lead generating lists of expired MLS listings from companies like Landvoice and RedX and use an automatic dialer to call prospective clients, whether or not they had not consented to receive such calls or had registered their telephone numbers on the national Do Not Call Registry.

No. 1:19CV657, 2020 U.S. Dist. LEXIS 128877, at *20 (M.D.N.C. July 22, 2020). As in *Hayhurst*, KWRI provided specific, detailed training and promotional materials that any

---

"between the defendants was insufficient to pursue the vicarious liability claim, because '[c]ommon ownership between two entities is insufficient to establish an agency relationship.'" ECF No. 38 at 10-11. Here, however, Plaintiff also alleges that, in addition to the owners and managers of FEO being employed by KWRI to run KW Wealth, Plaintiff also alleges that the KW Wealth program explicitly promotes telemarketing, real estate wholesaling—the conduct at issue here—and provides training, technical, and promotional support to facilitate such conduct. That is far stronger than the conclusory "common ownership" allegations advanced by the *pro se* plaintiff in *Jance*.

reasonable realtor would interpret as manifesting KWRI's expectation that agents conduct themselves as FEO and Mr. Tanner did, all while providing support services to facilitate doing so. In the case of *Hayhurst*, that additional support came via reference to using third party lead generating services. *See id*. In this matter, Plaintiff alleges that the additional support came in-house, via KW Wealth, along with the ancillary services KWRI offers to all of its agents. ECF No. 19 at ¶¶ 45, 62-83. Thus, the inquiry regarding actual authority is comparatively straightforward: did FEO act "consistent with [KWRI's] general statement of what the agent is supposed to do," ECF No. 38 at 13, when KWRI promoted FEO's owner's use of cold-calling to generate leads for the purpose of either (1) referring them for representation to KWRI agents, or (2) wholesaling the property and flipping it for the KWRI-affiliated agent's profit, with the added kicker that KWRI would teach KWRI-affiliated agents to do the same if they signed up for KW Wealth lessons? The Court should find that Plaintiff sufficiently alleges that the answer is yes; what else is implied by the suggestion by KWRI that its agents should "be their own ibuyer" via cold-call telemarketing to consumers? Critical, too, is that "Courts that have considered TPCA class actions sometimes construe 'specific, detailed training and materials,' from the broker to third-party agents as evidence that such agents had actual authority to make TCPA violative calls." *Usanovic v. EXP Realty LLC*, No. C23-0687JLR, 2026 U.S. Dist. LEXIS 67861, at *12 (W.D. Wash. Mar. 20, 2026).

Thus, the Court should find that Plaintiff sufficiently alleges that KWRI is liable via a theory of actual authority.[4]

**2. Plaintiff sufficiently alleges FEO acted with KWRI's apparent authority.**

Plaintiff also plausibly alleges that FEO acted with KWRI's apparent authority.

"Apparent authority holds a principal accountable for the results of third-party

---

[4] *See Dolemba*, 213 F. Supp. 3d at 997 ("Of course, these facts may not be sufficient to prove any theory of vicarious liability. They are more than sufficient, however, to entitle Dolemba to further discovery."); *Lushe v. Verengo Inc.*, No. CV 13-07632 AB (RZ), 2014 U.S. Dist. LEXIS 157124, at *13 (C.D. Cal. Oct. 22, 2014) (finding issue of fact based on principal's support of agent's calling).

beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." Restatement (Third) Of Agency § 3.01 at § 2.03 cmt. c. "The definition thus applies to actors who appear to be agents but are not, as well as to agents who act beyond the scope of their actual authority." *Id.* at § 2.03 cmt. a. Apparent authority ensures "[a] principal may not choose to act through agents whom it has clothed with the trappings of authority and then determine at a later time whether the consequences of their acts offer an advantage." *Id.* at § 2.03 cmt. c. It also results when the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he purported to have. *See Hawaiian Paradise Park Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 756 (9th Cir. 1969). Such manifestations of approval can come in many forms: "direct statements to the third person, directions to the agent to tell something to the third person, or the granting of permission to the agent to perform acts and conduct negotiations under circumstances which create in him a reputation of authority in the area which the agent acts and negotiates." *NLRB v. Donkin's Inn, Inc.*, 532 F.2d 138, 141 (9th Cir. 1976). The FCC further noted in *In re DISH Network* that a seller is responsible under the TCPA for a third-party telemarketer "if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct." 28 FCC Rcd at 6592.

The apparent authority argument is largely derivative of the actual authority argument, with the added caveat that it applies where the parties' actions would reasonably lead others to believe that FEO are agents of KWRI in circumstances where they *seem* to be agents of KWRI but are not, or where they are agents of KWRI, but acted beyond the scope of that intended agency. KWRI attacks this theory in two ways: first, arguing that Plaintiff failed to advance it in her complaint, and second, seeking to arbitrarily limit the analysis to instances where FEO's messages themselves identify KWRI—while also contending that this too would still be insufficient.

As to the first argument, KWRI contends that Plaintiff does not allege apparent

authority in her complaint. ECF No. 38 at 10 n.4. This is both incorrect, and irrelevant: incorrect because Plaintiff literally asserts that "FEO acted with KW National's *apparent and actual authority* in sending the messages at issue"—ECF No. 19 at ¶ 79; and irrelevant because Plaintiff did not need to do so: "A plaintiff need not separately plead a particular theory of vicarious TCPA liability to proceed on that theory." *Hollis v. eXp Realty LLC*, No. C25-0822JLR, 2025 U.S. Dist. LEXIS 187043, at *8 (W.D. Wash. Sep. 23, 2025); *see also McCurley v. Royal Seas Cruises, Inc.*, No. 21-55099, 2022 U.S. App. LEXIS 9079 (9th Cir. Apr. 5, 2022) ("plaintiffs did not waive their vicarious liability arguments based on a failure to specifically allege them in the consolidated complaint").

As to KWRI's latter argument demanding that the communications at issue must identify KWRI, the Court is not so limited in its analysis of apparent authority. For example, in *Soale v. eXp Realty LLC*, Judge Snow denied a motion to dismiss on the basis of apparent authority in the face of the following allegations:

> Plaintiff alleges that Defendant's website lists Jackson as one of its licensed real estate agents; that Defendant's website references that third parties like Jackson may contact consumers on its behalf; and that Defendant publicly advertises that it "provides lead generation training and mentorship . . . to its agents". In other words, Plaintiff received messages from someone purporting to work for Defendant and upon visiting Defendant's website, found that Defendant displayed Jackson as one of its real estate agents, purported to provide training for real estate agents like Jackson, and had given Jackson access to its branding and logos. Taken as true and considered cumulatively, these allegations of Defendant's manifestations would plausibly support a reasonable belief that Jackson was an authorized agent of Defendant.

No. CV-25-00773-PHX-GMS, 2026 U.S. Dist. LEXIS 47597, at *15-16 (D. Ariz. Mar. 9, 2026); *see also Chinitz v. Intero Real Estate Servs.*, No. 18-cv-05623-BLF, 2021 U.S. Dist. LEXIS 70436, at *18 (N.D. Cal. Apr. 12, 2021) (granting summary judgment to plaintiff on apparent authority where real estate broker defendant "listed the names of its agents on its website," "submitted the names of its associates to the California DRE," and provided training materials for callers identifying the defendant). Thus, the identification of KWRI, or FEO, need not be restricted to the communications themselves, and may

manifest in other ways, such as via promotional videos or websites, as is the case here.

As discussed *supra*, FEO's ownership and management team involves a group of Keller Williams agents, who also comprise most of "the team" that operates KW Wealth, and run their business out of a shared office space with KWRI's franchisee. ECF No. 19 at ¶¶ 10-11, 67-70. KWRI touts that it provides lead generation and technology platforms to its agents, *id.* at ¶ 91 n.15, and uses KW Wealth to teach agents to follow FEO's business. *Id.* at ¶¶ 61-83. And within KW Wealth are videos explaining how KWRI would train agents how to engage in real estate wholesaling, while touting the opportunities that arise from cold-calling consumers to seek their interest in either real estate representation (through KWRI) or to wholesale their homes. *Id.* at ¶¶ 45, 76.

Thus, the Court should find that KWRI's public manifestations, endorsement, and promotion of FEO (and Mr. Tanner) via its KW Wealth program and materials would reasonably lead the public to believe that FEO (and Mr. Tanner) were acting consistent with KWRI's instruction and authority, and find that Plaintiff plausibly alleges that KWRI is liable for the communications at issue based on apparent authority.

**3. Plaintiff sufficiently alleges that KWRI ratified FEO's conduct.**

Finally, Plaintiff plausibly alleges that KWRI ratified FEO's conduct.

Ratification is "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) Of Agency § 4.01(1). "A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." *Id.* at § 4.01(2). A principal assumes the risk of lack of knowledge and may be found willfully ignorant if "the principal is shown to have had knowledge of facts that would have led a reasonable person to investigate further, but the principal ratified without further investigation." *Id.* at § 4.06 cmt. d.

Plaintiff alleges that KWRI ratified FEO's conduct by both (1) promoting and encouraging FEO's actions directly while encouraging other Keller Williams-affiliated real estate agents to pay KWRI for training to adopt the same processes, and (2) accepting

leads generated by FEO's telemarketing campaign and agreeing to share revenue with KW AZ and FEO agents that arose out of FEO's telemarketing campaign. ECF No. 19 at ¶¶ 82-83, 129. Despite this, KWRI seeks dismissal on the basis that there are no allegations of (1) a "ratifiable event"; (2) affirmation by KWRI; and (3) knowledge of FEO's underlying conduct. ECF No. 24 at 17-18. This is entirely incorrect.

*McCurley* is particularly instructive on this matter. In *McCurley*, the Ninth Circuit reversed summary judgment as to ratification where a principal accepted leads generated by the direct caller, because it "had knowledge of facts that would have led it to investigate [the caller's] lead-generation activities to determine if it was calling only consenting individuals, but instead accepted leads generated by [the caller's] calls with scant investigation," which was further cemented by the overarching "evidence of widespread TCPA violations in the cruise industry, [that] would support a finding that [the principal] knew facts that should have led it to investigate [the caller's] work for TCPA violations." 2022 U.S. App. LEXIS 9079 at *6-8; *see also Brown*, 562 F. Supp. 3d at 610 ("DirecTV received complaints from people who were not DirecTV customers claiming to have received prerecorded calls. These complaints should have led DirecTV to further investigate its OCAs' calling practices."); *Naiman v. Blue Raven Solar, LLC*, No. 219CV01643JADEJY, 2021 U.S. Dist. LEXIS 183148 (D. Nev. Sept. 24, 2021) (finding ratification where defendant received formal and online complaints about calls and took no further steps to ensure compliance). Simply put, a party accepting the continued generation of leads from an external lead generator, despite receiving consumer complaints regarding the source of those leads, "presents a jury question on ratification under an 'acceptance of benefits' theory." *Williams v. Pillpack LLC*, No. 3:19-cv-05282-DGE, 2022 U.S. Dist. LEXIS 218979, at *28 (W.D. Wash. Dec. 5, 2022). Notably, where a business structure has been set up to remain willfully ignorant of the conduct of one's contractor to avoid liability, this too raises issues of fact for a jury as to ratification. *See*

*Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1076 (9th Cir. 2019).[5]

Here, Plaintiff alleges that KWRI accepted the benefits of FEO's telemarketing—both directly via commission on agent-represented transactions generated as a result of FEO's telemarketing without consent, and indirectly via accepting subscription payments to train other KWRI agents to follow FEO's model—and Plaintiff plausibly alleges that KWRI had knowledge of FEO's underlying conduct, given that KWRI heavily promoted such conduct and employed FEO's team to train KWRI's associated agents to follow FEO's model. ECF No. 19 at ¶¶ 82-83, 129. To be clear, Plaintiff identifies instances where KWRI posted promotional videos where it hosts FEO's owner touting the use of cold-calling consumers for the purposes of real estate telemarketing, and in that very video, touted how that would generate real estate leads for conventional real estate representation, and for KWRI's ultimate benefit. ECF No. 19 at ¶ 45.

In response to that clear evidence of KWRI's knowledge and promotion of its agents' cold-call telemarketing, KWRI offers up only the barest of defenses: the video has a fine print disclaimer essentially saying "by the way, do not break the law." *Compare* ECF No. 38 at 10 *with* ECF No. 19 at ¶ 45. In advancing the "but there's a disclaimer" argument, KWRI does not cite to any caselaw holding that the presence of such a disclaimer undermines a party's knowledge of its agent's conduct. Albeit in the context of disclaimers of agent/principal relationships, courts routinely find that similar disclaimers carry little weight, as the substance of the parties' actions and relationships control; not the legalese. *See, e.g.*, *Am. Home Mort. Corp. v. First Am. Title*, No. 07-1257, 2007 U.S. Dist. LEXIS 83337, at *18 (D.N.J. Nov. 9, 2007) ("If courts routinely recognized disclaimers of agency, parties could conduct themselves as principal and agent without legal ramifications that accompany that special relationship."); *Highline Capital Corp. v. Ahdoot*, No. 06-cv-2024, 2008 U.S. Dist. LEXIS 12580, at *26 (D. Colo. Feb. 20, 2008) ("courts routinely find such disclaimers only weakly probative of whether such

---

[5] Moreover, *Henderson* and *McCurley* were summary judgment rulings, which had the benefit of an evidentiary record. The Ninth Circuit found triable issues of fact in each case.

[agency] relationships in fact exist."). In fact, Judge Snow recently confronted a similar argument from a similar real estate brokerage defendant which had the following disclaimers in an agreement with its agents: "According to Defendant's Independent Contractor Agreement ["ICA"], its affiliated 'real estate agents are independent contractors and not employees.' Defendant's real estate agents 'receive commission, not salaries, . . . are responsible for their own taxes and benefits[,]' and must 'comply with 'all applicable laws, rules, and regulations when providing' services.'" *Soale*, 2026 U.S. Dist. LEXIS 47597, at *2. Judge Snow concluded, in denying the defendant's motion to dismiss, that "Defendant's treatment of its real estate agents as independent contractors and explicit disclaimer of 'an agency relationship between [Defendant] and its real estate agents' in its ICA . . . do not alter the Court's analysis of whether Plaintiff plausibly states a claim premised on vicarious liability." Otherwise, "do not violate the law" become magic words that usurp the concept of ratification in the first place. Moreover, given KWRI's assertion that the communications at issue do not qualify as regulated solicitations and therefore, do not violate the TCPA—an assertion the Ninth Circuit rejected—its generic warning "not to violate the TCPA" cannot reasonably be interpreted as an instruction not to engage in the conduct underlying this matter, as KWRI did not perceive it to be telephone solicitations in the first place.

Plaintiff provides direct evidence that KWRI knew that its agents at FEO were cold-call telemarketing—and actively promoted it to encourage other agents to pay KWRI to learn how to do the same with the KW Wealth program—and did so for KWRI's eventual benefit through front-end subscription fees and back-end commissions. In concert with Plaintiff's other allegations—that KWRI provides various technological platforms and services to further such an enterprise—and the other promotional materials raised by Plaintiff more-than-suffice to state a plausible claim for vicarious liability at this stage of the proceedings. Yet, KWRI argues that Plaintiff does not sufficiently plead that KWRI had knowledge of Mr. Tanner's (and FEO's) cold-calling practices, and therefore does not align with *McCurley*, because in *McCurley*, *at summary judgment* the Ninth

Circuit found that the plaintiff had sufficiently advanced knowledge that "the defendant *knew that the caller was using methods that violated the TCPA* and nevertheless accepted the benefits of the unlawful conduct." ECF No. 38 at 16 n.2 (emphasis in original). In other words, as KWRI's reasoning goes, *McCurley* is distinguishable because there is no corresponding evidence in the complaint that KWRI subjectively knew Mr. Tanner and FEO's cold-call telemarketing was illegal. But requiring that of Plaintiff at this stage would not be feasible,[6] and not necessarily even required: "even if there is no evidence that a real estate brokerage firm had knowledge of any specific calls made by its agents, the firm is not shielded from liability." *Usanovic*, 2026 U.S. Dist. LEXIS 67861, at *13.

KWRI advances a handful of additional arguments against the ratification theory, each of which are similarly premature at best, or just flatly wrong. KWRI argues that there must have been a specific "ratifying event," and that "the amended complaint never alleges that the caller was acting (or even purporting to act) as an agent on behalf of KWRI." ECF No. 38 at 14. These points are literally false, as the complaint outright states (1) "FEO was sending the text messages and calls for KW AZ and KW National's ultimate benefit," ECF No. 19 at ¶ 81, and "[b]ecause KW National knew and actively promoted Mr. Tanner (and FEO's) conduct, and encouraged other Keller Williams-affiliated real estate agents to adopt the same processes, . . .[sic] KW National ratified FEO's telemarketing and solicitation efforts." *Id.* at ¶ 82.[7]

KWRI's limited cited authority on that point is readily distinguishable. *Kristensen*

---

[6] Moreover, as the Northern District of West Virginia explained in *Mey*, "[r]equiring plaintiffs to allege summary-judgment type evidence at the motion to dismiss stage would establish a near-insurmountable pleading standard." 2016 U.S. Dist. LEXIS 203388, at *15. Discovery will provide the parties abundant opportunity to explore the limits of KWRI's knowledge; the pleading stage is not the correct juncture to adjudicate this issue.

[7] Presumably, on reply, KWRI will retort that this language is conclusory, and therefore "does not count." However, those conclusions result from Plaintiff's detailed allegations establishing KWRI's knowledge of FEO's telemarketing practices, and literal promotion of the conduct at issue, performed by FEO's owner, through the use of KWRI's official promotional channels, while teaching KWRI's other agents to do the same.

*v. Credit Payment Servs.* involved an appeal of a *summary judgment* ruling where the Plaintiff's sole plausible basis for a ratification theory of liability arose out of a contract with the entity that sent the messages, that stated that it "could use text message marketing and required AC Referral to comply with the TCPA." 879 F.3d 1010, 1015 (9th Cir. 2018). That's it. Plaintiff's complaint already alleges more than that without discovery, as it points to KWRI's active promotion of cold-call telemarketing, which is itself "the sort of red flag that would lead a reasonable person to investigate whether the agent was engaging in unlawful activities" that was absent in *Kristensen. Id.* And in *Winters v. Quicken Loans Inc.*, the plaintiff's ratification theory arose solely out allegations tied to a *hypothetical* marketing contract between a defendant and a telemarketer, and the court unsurprisingly found that such hypothetical arguments were insufficient. No. CV-20-00112-PHX-MTL, 2021 U.S. Dist. LEXIS 209695, at *16 (D. Ariz. Oct. 29, 2021). Here, of course, Plaintiff cites records and videos that actually exist, and are not merely hypothetical.[8]

Lastly, KWRI contends that Plaintiff's allegations regarding its affirmation of the telemarketing conduct are "too remote." ECF No. 38 at 15. In advancing this argument, KWRI acknowledges that FEO's telemarketing operations leads to transactions in which it receives commission from its affiliate agents, but still tries to downplay the significance of it. Specifically, KWRI argues that "KWRI in turn might receive a small capped portion of the proceeds from a representation resulting in a transaction," characterizing it again as a "small portion of the proceeds," and therefore asks the Court to conclude that KWRI's incentives are essentially too small to care about FEO's actions. *See id.* But this is entirely premature conjecture; Plaintiff identifies KWRI's commission sharing structure as "a 6% fee on each transaction, capped at $3,000," but to ask this Court to conclude that a $3,000

---

[8] And in *Canary v. Youngevity Int'l, Inc.*, the court granted a motion to dismiss without prejudice where the plaintiff's theory of vicarious liability stemmed from a specific person's voice *possibly* being used in a prerecorded message, and otherwise assuming that the remaining elements of ratification fell in place as ancillary issues tied to that person's possible status as an employee of the company. No. 5:18-cv-03261-EJD, 2019 U.S. Dist. LEXIS 46429, at *8 (N.D. Cal. Mar. 20, 2019).

fee *per transaction* is, as a matter of law, too insignificant to qualify as a meaningful benefit to KWRI is absurd at this juncture. Discovery is necessary to determine if KWRI's commission payments are too insignificant a portion of its business model for it to care about its agents' actions, and Plaintiff anticipates that will not bear out in KWRI's favor.

Building off this untenable position, KWRI continues that the insignificance of these $3,000 sums "is especially the case for the communications here, which were made by a third party, did not result in any conventional real-estate representation of the caller—and therefore resulted in no proceeds at all." *Id.* This suggests an even-more untenable argument: that Plaintiff was required to transact with FEO in order for Plaintiff's allegations against Defendants to hold water. But that is not required under the TCPA, as numerous courts have made explicit, *including the Ninth Circuit in this very matter. Coffey v. Fast Easy Offer, LLC*, 178 F.4th 480, 483 (9th Cir. 2026) (noting that the purpose of initiating a telemarketing communication controls the analysis, even without a purchase made by Plaintiff); *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012) (same). In other words, that KWRI made no profit off of the specific communications directed to Plaintiff is of no consequence, and the inquiry is instead whether part of the animating purpose of FEO's communications was to conduct real estate transactions that would benefit KWRI in a foreseeable and intended manner. Given the Ninth Circuit's ruling that Plaintiff sufficiently alleged that the communications qualify as real estate telemarketing based on videos hosted by KWRI promoting FEO's conduct, the Court should find that its endorsement of, and acceptance of benefits from, FEO's telemarketing is not "remote." *See, e.g.*, *Hayhurst*, 2020 U.S. Dist. LEXIS 128877, at *17 (agency allegations sufficient where "[t]here are the numerous videos on KWConnect.com about using expired listings to generate leads; the various scripts for Keller Williams agents to use when calling individuals with expired listings, one of which was similar to the pre-recorded message Karmel left for Hayhurst[.]").

## V. Conclusion

For the foregoing reasons, the Court should deny KWRI's motion in its entirety.

Date: September 9, 2026.

By: */s/ Alex D. Kruzyk*
Alex D. Kruzyk (*pro hac vice*)
akruzyk@pkglegal.com
Bryan A. Giribaldo (*pro hac vice*)
bgiribaldo@pkglegal.com
**Pardell, Kruzyk & Giribaldo, PLLC**
7500 Rialto Blvd. Suite 1-250
Austin, Texas 78735
Tele: (561) 726-8444

*Counsel for Plaintiff and the proposed Class*